J-S26003-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 297 MDA 2026 |

Appeal from the Order Entered January 6, 2026
In the Court of Common Pleas of Lebanon County
Juvenile Division at No(s):  CP-38-DP-0000055-2025

| | | |
|---|---|---|
| IN THE INTEREST OF: M.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 298 MDA 2026 |

Appeal from the Order Entered January 6, 2026
In the Court of Common Pleas of Lebanon County
Juvenile Division at No(s):  CP-38-DP-0000056-2025

BEFORE:  PANELLA, P.J.E., NICHOLS, J., and NEUMAN, J.

MEMORANDUM BY PANELLA, P.J.E.:                **FILED: JULY 22, 2026**

J.C. ("Father") appeals from the orders entered in the Court of Common Pleas of Lebanon County on January 6, 2026, that adjudicated his children, N.C. (born July 2015) and MC. (born January 2019) (collectively "Minor Children"), dependent. After our careful review, we affirm.

We take the following factual and procedural history from the trial court's opinion:

[Father] and [A.F.] (hereinafter "[N.C.'s Mother]") are the biological parents of N.C. .... Father and [J.M.] (hereinafter ["M.C.'s Mother"]) are the biological parents of M.C. .... On November 7, 2025, Lebanon County Children and Youth Services (hereinafter "CYS") received a referral regarding N.C. The referral alleged that Father had backhanded [N.C.] in the face due to her sneaking food. Father was also previously indicated as a perpetrator of abuse against N.C. when she was approximately two months old. After being approached by CYS regarding the referral, Father admitted to slapping N.C. Father also acknowledged that he had blood on his fingers after slapping [N.C.]

A verbal safety plan was implemented at that point. However, Father became uncooperative with CYS and refused to comply with the verbal safety plan shortly after it was put in place. In violation of the safety plan, [] [F]ather refused to let CYS interview the [M]inor [C]hildren and one day neglected to send them to school. As a result, CYS requested for and was granted [emergency] legal and physical custody of the [M]inor [C]hildren pending a full adjudication/dispositional hearing. Despite CYS having legal and physical custody of the Minor Children, Father refused to turn the [Minor C]hildren over to CYS immediately. With the assistance of the paternal aunt and grandmother, [] [F]ather seemed to be concealing the [Minor C]hildren's whereabouts.

While in the [c]ustody of CYS, the [M]inor [C]hildren disclosed that they were scared of Father[,] claiming that when he was angry, he would yell, punch walls, and slam doors. The [M]inor [C]hildren went on to describe how Father had them squat until their muscles burned and hit them with belts or his hands. Although the referral that prompted CYS to become involved in this case concerned N.C. being struck by Father, M.C. told CYS that Father would also hit her. Additionally, CYS caseworkers were notified by N.C. that she did not have her nighttime insulin with her. CYS requested the insulin from Father and instead of cooperating and providing [N.C.]'s medication, he laughed and stated, "Now you need me, I guess you need to figure it out[.]"

A caseworker testified that N.C. suffers from severe depression and suicidal thoughts. N.C. was undergoing outpatient therapy at the time of the adjudication hearing. Additionally, CYS received information that M.C. had never seen a doctor or dentist, and N.C. had not seen a primary care physician in three years. However, the [M]inor [C]hildren are safe and receiving the support they need in their current placement. In addition, the [M]inor [C]hildren are attending school. Testimony was also presented showing the strong bond the [M]inor [C]hildren have with one another. Due to their current placement in the same foster home, the [M]inor [C]hildren are able to continue that relationship.

Testimony was also presented regarding potential kinship resources, but none were approved at the time of the [January 5, 2026,] Adjudication Hearing. [] [F]ather identified the paternal grandmother as a potential resource, but she was ultimately denied because CYS didn't believe she would cooperate with them since she had previously told the [M]inor [C]hildren not to trust CYS. Paternal [g]randfather was also identified as a potential resource, but because of their strained relationship, Father would not sign off on grandfather being a kinship option. Furthermore, even if the grandfather was approved as a kinship resource, the grandfather lives out of state, and the court believes that the distance would make the ultimate goal of reunification extremely difficult. [M.C.'s Mother] would also be a possible resource, but as of now, she wouldn't be accepted because she continues to reside with [] [F]ather. Moreover, given that it seems she was aware of the abuse and permitted it to continue, it is uncertain if CYS would permit the [M]inor [C]hildren's return to her until she completed her goals.

Trial Court Opinion, 3/4/26, at 4-7. On January 6, 2026, the court entered the dispositional order adjudicating the Minor Children dependent. Father timely appealed.[1] [2]

---

[1] The Minor Children's Mothers have not appealed the adjudicatory orders.

[2] Father failed to file a Rule 1925(b) statement contemporaneously with his notice of appeal as required by our Rules. *See* Pa.R.A.P. 1925(a)(2)(1). The
*(Footnote Continued Next Page)*

Father raises the following questions for our review:

1. Whether the lower court erred and/or abused its discretion in granting [CYS]'s request for adjudication with respect to N.C.?

2. Whether the lower court erred and/or abused its discretion in granting [CYS]'s request for adjudication with respect to M.C.?

Father's Brief, at 4 (unnecessary capitalization omitted).[3] As Father's issues are related, we will address them together.

We review the trial court's decision in this matter for an abuse of discretion, which only exists "when the court has overridden or misapplied the law, when its judgment is manifestly unreasonable, or when there is insufficient evidence of record to support the court's findings." *Interest of J.F.*, 308 A.3d 1252, 1256-57 (Pa. Super. 2024) (citation omitted). When conducting this review, we are required "to accept the findings of fact and credibility determinations of the juvenile court if they are supported by the record; but it does not require the appellate court to accept the juvenile court's inferences or conclusions of law." *Interest of M.G.*, 331 A.3d 703, 716 (Pa. Super. 2025) (citation omitted).

_____

trial court and CYS recommend quashal on this basis. *See* Trial Court Opinion, 3/4/26, at 1; Appellee's Brief, at 5-6. However, we decline to quash this matter since Father's counsel filed the statement of errors on April 2, 2026 pursuant to our Rule to Show Cause and the court was able to thoroughly address Father's issues on appeal.

[3] The Minor Children's GAL failed to file an appellee's brief, which we deem wholly unacceptable. *See Interest of S.D.*, 334 A.3d 919, n.2 (Pa. Super. 2025).

- 4 -

> [T]o adjudicate a child dependent, a trial court must determine, by clear and convincing evidence, that the child:
>
>> is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent … that places the health, safety or welfare of the child at risk.
>
> 42 Pa.C.S.A. § 6302(1). "Clear and convincing" evidence has been defined as testimony that is "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re C.R.S.*, 696 A.2d 840, 843 (Pa. Super. 1997) (citation omitted).
>
> In accordance with the overarching purpose of the Juvenile Act "[t]o preserve the unity of the family wherever possible," *see* 42 Pa.C.S.A. § 6301(b)(1), "a child will only be declared dependent when he is presently without proper parental care and when such care is not immediately available." *In re R.T.*, … 592 A.2d 55, 57 (Pa. Super. 1991) (citation omitted). This Court has defined "proper parental care" as "that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." *In re C.R.S.*, *supra* at 845 (citation omitted).

*Interest of Q.R.*, 199 A.3d 458, 437 (Pa. Super. 2018) (citing *In re A.B.*, 63 A.3d 345, 349 (Pa. Super. 2013)).

> Here, the trial court explains:
>
> the court is unwavering in its conclusion that the Minor Children, N.C. and M.C., are Dependent Children pursuant to 42 Pa.C.S.[A.] § 6302(1). … In addition to the Dependency Petitions filed in this case, the court considered testimony presented at [the] Shelter Care Hearing on November 20, 2025, and [the] Dependency Adjudicatory Hearing on January 5, 2026, when rendering its decision.

\*\*\*

As previously stated, Father admitted to striking N.C. in the face and was previously indicated as perpetrator of abuse regarding the same minor child. Both [M]inor [C]hildren disclosed to CYS that Father hits them and expressed that they are afraid of him. The court also found that CYS made reasonable efforts to prevent the placement. However, Father was uncooperative and would not comply with the safety plan. The court emphasizes that while Father did not cooperate with CYS on multiple occasions, on one occasion he refused to cooperate to the point that it could have been harmful to [N.C.] when he refused to-provide CYS with the child's insulin medication. Additionally, the Minor Children are bonded and are currently placed in the same foster home, where they are safe and all their needs are being met. Therefore, the court found it is in the best interest of the Minor Children to remain in placement with a goal towards reunification.

Trial Court Opinion, 3/4/26, at 4, 6-7 (unnecessary capitalization omitted).

We discern no abuse of discretion.

CYS caseworker Keys Rodriguez testified CYS received a referral for physical abuse on November 7, 2025, that alleged that Father "backhand[ed]" N.C. for eating coconut shavings, which Father admitted to doing because N.C. has type one diabetes. *See* N.T., 1/5/26, at 7; N.T. 11/20/25, at 6. N.C. told CYS that she tried to go to Father that day but he ignored her. *See* N.T., 1/5/26, at 7; N.T., 11/20/25, at 6. At the time of the incident, M.C.'s Mother was in the home, where she resides with Father and the Minor Children. *See* N.T., 1/5/26, at 15. Father would not allow N.C. to see her own mother as further punishment for eating the coconut shavings. *See* N.T., 11/20/25, at 14. M.C. reported to CYS that Father also hits her. *See id.*

At the time of the Minor Children's removal, CYS wanted to implement a safety plan in lieu of taking the Minor Children into custody, and although

Father verbally agreed to the plan on Friday November 7th, he refused to sign it on Monday November 10th because he claimed CYS was "being shady" and his parental rights were being violated. *See id.* at 7. CYS wanted to interview N.C. to ensure her safety, as Father admitted hitting N.C. in the face and had been indicated as a perpetrator of abuse on N.C. when she was two months old. *See id.* at 8. Father initially refused to allow CYS to interview N.C., but then allowed Rodriguez to interview her on November 13, 2025, as long as he was present. *See id.* On November 14, 2025, Father failed to send the Minor Children to school in violation of the safety plan. *See* N.T., 1/5/26, at 8. CYS placed the Minor Children in foster care that day. When they later called Father for N.C.'s insulin because her sugar was low, he refused, laughed, and told Rodriguez, "now you need me? I guess you have to figure it out." *Id.* at 5. Rodriguez took N.C. to the emergency room to obtain the medication. *See id.*; N.T., 11/20/25, at 16. She testified that, to the best of her knowledge, Father was aware that if she could not obtain the insulin, it would harm N.C. *See* N.T., 1/5/26, at 55.

On November 20, 2025, after an emergency hearing, the trial court granted CYS with emergency protective custody of the Minor Children. *See* N.T., 1/5/26, at 9; N.T. 11/20/25, at 33. Pursuant to the December 15, 2025, child permanency plan, the primary permanency goal is for the Minor Children to return home, with a concurrent goal of adoption. *See* N.T., 1/5/26, at 10. M.C.'s Mother has been doing "pretty well" in cooperating with the

permanency plan goals, but she had not signed the permanency plan as of the dependency hearing because she did not agree with its narrative. ***See id.*** at 12-13, 16. Rodriguez testified that there was an open investigation case regarding N.C.'s Mother, who has been cooperative in signing paperwork, but it was unknown if she had started any parenting classes or attended her psychiatric evaluation. ***See id.*** at 13; N.T., 11/20/25, at 12. Father willingly went to the CYS office to speak with Rodriguez and had started parenting classes and maintains stable housing but, like Mother of M.C., he would not sign the permanency plan and had not provided CYS with proof of income. ***See*** N.T., 1/5/26, at 14.

Rodriguez testified that Father's weekly supervised visits with each of the Minor Children were going "pretty well." ***Id.*** at 14-15. However, even if Father moved out of the family home, CYS would not allow the Minor Children to live with M.C.'s Mother because of both of parents' untreated mental health issues, concerns about the lack of parenting, and their lack of cooperation with CYS. ***See*** N.T., 11/20/25, at 17. N.C. has outpatient therapy for diabetes management with which she is complying with the foster parents' assistance. ***See*** N.T., 1/5/26, at 11; N.T., 11/20/25, at 10. N.C. also has been diagnosed with thyroid disease and asthma, all of which she has been receiving treatment for since she has been in care. ***See*** N.T., 1/5/26, at 20. M.C. has never been to a dentist or primary care physician and N.C. had not been to her primary

care physician in three years (since she's been living with Father) as of the dependency hearing. *See* N.T., 11/20/25, at 9-10, 13.

Rodriguez testified that N.C. is in mental health therapy that causes her to miss school, where she is in the fifth grade. *See* N.T., 1/5/26, at 18. Concerningly, N.C. has reported thoughts or past occurrences of self-harm due to her fear of Father. *See id.* at 19. N.C. stated that, prior to moving in with Father three or four years ago, she never had these types of thoughts. *See id.* Because of this, Rodriguez testified it would be in N.C.'s best interest to complete the mental health therapy program. *See id.*

Rodriguez testified that the Minor Children are together in their foster home where they are "thriving" and doing "great." *Id.* at 9; *see also* N.T., 11/20/25, at 9. Rodriguez testified that the foster parents are using "a reasonable and prudent parenting standard," and that foster care is "the least restrictive setting" for them in the current settings. N.T., 11/20/25, at 10; N.T., 1/5/26, at 16.

Based on the foregoing, we conclude the record more than adequately supports the trial court's disposition, as it reflects clear and convincing evidence to support the trial court's finding that Father's conduct places the Minor Children's health, safety and welfare at risk, and that the adjudication of dependency is in their best interest. Therefore, we affirm the dispositional order adjudicating the Minor Children dependent.

Order affirmed.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 7/22/2026